PLATT *et al.*, executors, etc., v. PLATT.

*Partnership — transactions between partners — undue influence — void trans-
fers — collusive foreclosure — laches — review of equitable proceedings.*

Defendant and a younger brother were copartners in business, carrying on two
extensive establishments. The brother, in consequence of unfortunate pri-
vate transactions and ill health, became mentally enfeebled. While in that
condition, at the earnest solicitation of defendant, the brother consented to
the transfer of his interest in one of the establishments upon the books
of the firm to the defendant and ordered it to be done. At about the same
time, he conveyed to the defendant by deed all his interest in real estate, of
considerable value, owned by the firm. About nine months afterward, the
brother being sick at home, defendant caused to be made out an erroneous
balance sheet, wherein, by means of false and improper entries, the interest
of the brother in the firm property was made to appear very small in amount,
although, at the time, the real amount or value of his interest was very large.
The defendant at the time expressed a determination to wipe out his brother's
interest altogether. The brother took no part in making out this balance
sheet, and did not consent to the methods employed in making it, but was
induced by defendant to transfer, in consideration of the amount of his
apparent interest upon such balance sheet, his interest in the second estab-
lishment. On the same day he conveyed by voluntary deeds valuable lands
owned by him in Cayuga and Wayne counties, and three days thereafter, by
voluntary deed, valuable real estate in New York owned by him, and consti-
tuting the remainder of his property. This last conveyance was proved to
have been made in consequence of threats and promises of defendant at the
time. While these transfers were being negotiated, defendant held out to
the near relatives and friends of his brother that it was necessary to do what
was being done in order to prevent the brother's property being seized to
satisfy his individual liabilities, and to avoid embarrassment to the firm
business, but there was no evidence that the brother transferred his property
to avoid payment of his debts, and he had no reason so to do. At the time
of the transfer of the first establishment, the knowledge of the condition of
the business of the same was exclusively with defendant, and the brother
never knew how it stood, and in this action defendant declined to produce
such account books as were kept in connection with it.

In an action by the executors of the brother to set aside the transfers of the
property, on the ground of fraud and undue influence, *held*, that the burden
of proof was with the defendant to show that the transfers first made were
the result of investigation, and that the consideration was fair and adequate,
or, at least, arrived at after the brother had the same light that defendant
possessed.

Equity will scrutinize agreements between partners closely and watchfully,
and will not permit them to stand if it can discover that they were brought
about by concealment, unfairness, or other unconscionable conduct.

*Held*, also, that the relation of blood and that of trust growing out of the partnership indicated, when taken in connection with the brother's feeble state, the existence of dominion and influence, and called for proof of the purity of the transactions. Plaintiffs established affirmatively the existence of undue influence, which not being controverted by defendant, the transfers should be set aside.

Certain mortgages upon the real estate were foreclosed at the instigation of the defendant, who purchased at the foreclosure sales. *Held*, that he acquired no better title thereby.

The plaintiffs waited some years after they were entitled to bring the action before commencing it. *Held*, that they were not guilty of laches, the statute not having run and no estoppel or acquiescence being shown.

In equity actions the court will always look at the entire case, and see whether substantial justice has been done, and where that appears, it will affirm the judgment, notwithstanding the admission of testimony which, in ordinary actions at law, might have necessitated a new trial.

THIS is a motion by the defendant, for a new trial, under section 268 of the Code, and to set aside the decision of Mr. Justice FANCHER, at special term.*

The facts are sufficiently stated in the opinion.

---

* The following is the opinion delivered at special term :

FANCHER, J. : The questions in this action deserve and have received careful consideration. They are important, and involve grave consequences. I have considered the testimony in the case, and the arguments of counsel, and I have examined the numerous authorities cited in the very exhaustive briefs on both sides.

The time at my command will permit me to state concisely only the leading facts of the case, the principles which I consider applicable to it, and the conclusions at· which I have arrived. .

The right of the plaintiffs to maintain such a suit as the present has not been denied. They are not only the executors of Nathan C. Platt, and, therefore, the proper parties to prosecute for an accounting of the affairs of the partnership, if there are equitable grounds of such relief, but they also take in fee, under the will of Nathan C. Platt, all his real estate. Section 113 of the Code authorizes executors to sue without joining with them the persons for whose benefit the action is prosecuted. As executors, the plaintiffs have an interest to reach all the property of the testator, real and personal, especially to enable them to pay the debts of the deceased.

Perhaps, therefore, it is hardly necessary to cite the statute of 1858 (Laws 1858, ch. 314), to sustain the action, although the provisions of that act are probably broad enough to enable executors to bring such an action, even when the testator has not made them devisees of his real estate. See, also, *Bryant* v. *Bryant*, 2 [Rob. 612; *Babcock* v. *Booth*, 2 Hill, 181.

The defendant and his deceased brother, Nathan C. Platt, were partners for nearly thirty years. They were engaged in smelting and refining precious metals, and also in selling jewelry, plated ware and watches. Besides their stock in trade, accounts and receivables, they owned jointly, in 1860, two valuable parcels of real estate, in Maiden lane and Liberty place, in the city of New York, where their business was carried on; some lands in Cayuga county, which seem to have been purchased as a speculation; and one hundred shares of the stock of the Artisans' Bank. Nathan C. Platt was also the owner, individually, of some other lands in Cayuga and Wayne counties, and of a large and valuable piece of real estate, consisting of two lots on Nassau street, in the

Platt v. Platt.

*Stephen P. Nash,* and *Hutchins & Clinch,* for appellants. Oral evidence, that the transfers were in trust, should not have been admitted. 44 N. Y. 156 ; 20 id. 39 ; 1 Johns. Ch. 339 ; 6 Barb. 98.

city of New York. In 1856, Nathan C. Platt became the president of the Artisans' Bank. In 1860 the bank became embarrassed, and Nathan C. Platt's own affairs then became complicated by his connection, as city chamberlain, with the money of the city of New York, deposited in the bank. The deposits were removed, and the bank failed. The evidence shows that these difficulties had a serious and depressing effect upon him, and that he was never afterward the man he had been before. His courage was broken, his spirit was mortified, his power of will was enfeebled, and his energy and mental capacity were weakened. At the same time claims were made against him, and prosecutions were commenced, or threatened, for liabilities in which he had become involved through his transactions with the bank. These occurrences, undoubtedly, greatly contributed to disturb and alarm him. The defendant also appears to have been excited and alarmed. It is not denied that the defendant about this time determined and openly expressed his determination to sever his connection with his brother. He took steps to get rid of him as a partner, and to secure or retain the business, and continue it himself. On the 18th of October, 1860, one large and important, and, perhaps, the most profitable portion of their business — the refining and smelting department — was transferred to the defendant by entries on the partnership books. It was charged to him at the value at which the stock and property employed in that department of the business, appeared on the books kept in the Maiden lane premises. There is no evidence or appearance of any negotiation or hesitation about this transfer. There was no inventory taken, nor any investigation of real values made. There was nothing allowed for the good will of the business. On the other hand, there was no attempt, as was the case in the subsequent transfer of the other department of the business, to reduce or depreciate the value of the property or the interest of Nathan C. Platt. Two days after this transaction, or after the entry upon the books concerning it, Nathan C. Platt conveyed to the defendant his half of the real estate in Maiden lane and Liberty Court, which the partnership owned and occupied. The consideration named in the deeds was the price these properties had cost many years before. I am satisfied, upon the evidence, that both of these parcels were then worth much more. The consideration thus named, although not so grossly inadequate that a court of equity would be required to set the deeds aside for that cause alone, was yet so inadequate as to confirm the account of these transactions given by the plaintiff's witnesses, and to convince me that they were not fair and ordinary bargains and sales, such as would take place between parties dealing with each other on fair terms, upon the footing of real values, nor such as should be allowed between parties who stood to each other in relations of confidence or partnership.

In February, 1861, as was the usage of these partners, an inventory of their stock in trade was taken. This was after the execution of the conveyances to which I have just referred, and after the smelting business which had been conducted at Liberty Court had been relinquished by Nathan C. Platt, according to the entries made on the partnership books. Nathan C. Platt's share of the partnership assets, however, still appeared to be worth nearly $180,000. There was considerable discussion, and some evidence at the trial, as to the manner in which the goods in the store were estimated in the inventory of February, 1861. I think the evidence shows that they were put down fairly at what was believed to be their value, and that the weight of evidence is, that the inventory represented at that time the value of the goods with reasonable correctness. There is an entry in the balance sheet of February, 1861, which seems to indicate that Nathan C. Platt's interest in the business had been or was to be terminated. I refer to the fact that the merchandise was entered under the title of "new concern." No transfer, however, had been made, nor any changes or credits to accomplish any such termination at the time of the making of that inventory. After this time two balance-sheets or statements of business affairs were made, which have been produced, both dated 23d day of May, 1861. Nathan C. Platt had by this time become so ill and

*Allegans suam turpitudinem non est audiendus.* 4 Hill, 424; 1 Wall. 58. The dealings for the purchase and sale of the entire partnership assets between the partners, when a dissolution was

enfeebled that he was confined nearly, if not quite, all the time to his house, and was substantially disabled from attending to business. It appears that both of these balance-sheets were made under the direction of the defendant. By the first of these Exhibits, Nathan C. Platt still appeared to have an interest, valued at upwards of $80,000, The witnesses for the plaintiffs, including both the plaintiffs themselves, but the book-keeper, Mayhew, who seems to be entirely removed from influence as well as interest, testify that the second account of May 23d, 1861, was made up under the supervision of the defendant, and because of his dissatisfaction with the result exhibited by the first statement of that date. I am compelled to credit the statements of these witnesses, that the defendant entertained and acted upon a purpose to reduce the value of his brother's interest, as exhibited on this balance-sheet, to little or nothing. These witnesses are corroborated by the surrounding facts, and by all the history of the transaction.

The conduct of Nathan C. Platt is inexplicable, except upon the theory that he was controlled by the defendant. The preparations of these accounts successively, the charges made in the partnership books against Nathan C. Platt, and the reduction of apparent values by sweeping deductions, were all dictated by the defendant, even if consented to by his brother. The purpose of all this cannot be mistaken; and it is expressly described in the language which the witnesses say the defendant used. It was " to wipe out " the interest of the enfeebled partner. The assent of that partner to this course, and to the transfer which he was asked to make, was procured by the overmastering influence of the defendant, and by hopes and expectations which he led his brother to cherish of protection and restitution.

Nathan C. Platt's interest was reduced upon the second of these balance-sheets of May 23, 1861, to a nominal amount, and that exhibit was produced to him, signed by his brother, before his own signature to it was obtained.

Without referring further to the particular testimony on the subject, it is plain that this statement was made for the purpose of showing to Nathan C. Platt himself, or to other parties, and perhaps to both, that his interest in the partnership property was worth nothing. Nathan C. Platt was either induced to believe that his interest was of trifling value, or he was pursuaded that it was necessary for the interest of himself and his family, as well as of his brother, that his share of the firm property should be placed out of his hands. He was thus induced to consent to the dissolution of the partnership and to the execution of a paper releasing and relinquishing to the defendant all his interest in the partnership business and property, and also to make conveyances to the defendant of all the property which he owned, either as an individual or a copartner. I do not perceive any evidence that Nathan C. Platt was really so far seriously embarrassed, or, at least, that his obligations amounted to so large a sum, that, if his property could have realized its value, it would not have left him a large surplus. Nor do I discover evidence, that left to himself, he wished to avoid the payment of his debts. If any such purpose entered into his mind, or formed the motive for any of these conveyances, I am satisfied it was impressed upon him by the peremptory actions and declarations of the defendant. The relations between these parties were such, that the defendant was bound to the utmost good faith, and to abstain from exerting an influence to control the will of his brother; he was bound also to allow him the benefit of independent professional advice, and of all the knowledge which he himself possessed. I think these accounts which were exhibited were made with a purpose, and were, in fact, untruthful; and it is perhaps not too much to say that, under the circumstances, they were fraudulent. Nathan C. Platt's interest in the partnership assets was apparently extinguished by the introduction or the use made of a " suspense account " of $124,000. This was done also by putting down the merchandise, after it had been inventoried at its value, at a discount arbitrarily made of twenty-five per cent upon that value, and the transfer of the goods at a depreciated

agreed upon, was proper. 53 Barb. 285; 45 N. Y. 71; Lind. 791–796; 9 Grattan, 204; 13 Ill. 298; 3 S. & G. 410; 11 Ben. 322; 2 M. & G. 10; 56 Barb. 84; 45 N. Y. 71. Plaintiffs were guilty of laches. 37

rate to the defendant, and by charging Nathan C. Platt with various amounts for which he was not legally liable, and which, so far as appears, he had never agreed to assume. The question of these values is not to be treated as upon an absolute sale to a stranger, or for a consideration actually paid in money. It was a transaction between partners, one of whom was sick and disabled and the other well and active; between brothers, one of whom was in health, and who possessed naturally no inconsiderable degree of influence and control over his junior brother, and the other of whom was disabled by sickness, and prostrated by adverse circumstances. The good-will of the business went with the goods, and all at large deductions from their real value. These transfers were accompanied or followed by conveyances of real estate, owned by Nathan C. Platt, in Nassau street and in Cayuga and Wayne counties, which, it is admitted, were entirely voluntary, without consideration, and, so far as it appears, without motive, unless we can discern the motive in the history of the whole transaction. In all this it does not appear that Nathan C. Platt had any independent legal advice, while it does appear that he was reluctant to execute the final instrument, which should place him entirely in the hands of the defendant, and terminate his interest in the partnership.

If the account which is given by the witnesses for the plaintiffs be true, and it is strongly corroborated by the surrounding features of the case, this final transfer was not obtained without the direct exertion of the defendant's influence over his brother. The law looks upon parties who occupy such relations as these men sustained to each other, as bound to a degree of good faith and fair dealing, which is stricter and more conscientious than that which is regarded as within the limits of supposed proper dealing in the world of trade. The standard is higher than the common morality of trade. *Blisset* v. *Daniel*, 10 Hare, 536; Lindley on Part. 492, book 3d, chap. 2d, 792–3, book 3d, chap. 10, § 3; Collyer on Part. 99, § 178; *Maddeford* v. *Austwick*, 1 Sim. 89; *Lees* v. *Laforrest*, 14 Beav. 250; *Perens* v. *Johnson*, 3 Sm. Giff. 419; *Clements* v. *Hall*, 2 De G. & J. 173.

A party insisting upon the validity of conveyances and transfers, which were executed by a sick and enfeebled man, for no consideration, or for considerations below the real value of the property, should be ready to show satisfactorily why they were executed, and to make it appear that no undue influence was exerted on the one side, and no submission to improper persuasion or promises was yielded to on the other; and where the party benefited by such transfers stands in such relation to the grantor, that undue influence may have been exerted, and no proof is offered to rebut its existence, it may be presumed. *Hall* v. *Hall*, 1 P. & D. 481; *Rhodes* v. *Bate*, L. R., 1 Ch. App. 257; *Dent* v. *Bennett*, 4 M. & Cr. 273; *Page* v. *Horne*, 11 Beav. 227; *Harvey* v. *Mount*, 8 id. 439; *Brooke* v. *Berry*, 2 Gill. (Md.) 83; *Lyon* v. *Home*, L. R., 6 Eq. Cas. 655.

Such transactions have frequently been condemned by courts of equity. *Huguenin* v. *Baseley*, 14 Ves. 273; *Clarke* v. *Malpas*, 31 Beav. 80; *Grosvenor* v. *Sherratt*, 28 id. 659; *Lyon* v. *Home*, L. R., 6 Eq. Cas. 655; *Page* v. *Horne*, 11 Beav. 227; *Harvey* v. *Mount*, 8 id. 439; *Sears* v. *Shafer*, 1 Barb. 408; 6 N. Y. 272; *Voorhees* v. *Voorhees*, 39 id. 465; *Brice* v. *Brice*, 5 Barb. 533; *Tyler* v. *Gardiner*, 35 N. Y. 592; *Whelan* v. *Whelan*, 3 Cow. 537; *Kinne* v. *Johnson*, 60 Barb. 69; *Carpenter* v. *Danforth*, 52 id. 581; *Williams* v. *Bayley*, L. R., 1 H. L. App. 200; *Boyse* v. *Rossborough*, 6 H. L. C. 2, 49; *Osborne* v. *Williams*, 18 Ves. 379; *Eadie* v. *Slimmon*, 26 N. Y. 9.

Upon the promise of the defendant to restore the property, after the emergency was past, both parties were in *delicto*, but not in *pari delicto*, and the defendant could not retain property obtained upon such a promise. *Long* v. *Long*, 9 Md. 348; *Ford* v. *Harrington*, 16 N. Y. 285; *Davies* v. *Otty*, 35 Beav. 208; *Blisset* v. *Daniel*, 10 Hare, 536; *Maddeford* v. *Austwick*, 1 Sim. 89.

Even a stranger could not take such deeds and transfers, unless the good faith and

N. Y. 155; L. R., 1 Ch. 616; L. R., 7 Eq. 154; 8 D. G. M. &. G. 787; 50 Barb. 258; 2 Cow. 139; 4 Keyes, 469; 1 Curt. C. Ct. 206; 49 N. Y. 10.

honesty of the transaction appeared, and it would be essential to be shown that the donor knew what he was doing; that his acts were free and uninfluenced, and that he was protected by independent, disinterested advice. This is the equity rule, independent of considerations of fraud, especially where the relations of the parties are intimate and confidential. Under such circumstances, a party taking such transfers, and insisting upon the retention of the benefits they confer, must justify them.

The iniquity of them may be inferred from the circumstances, without direct proof of fraud. *Phillips* v. *Mullings*, L. R., 7 Ch. App. 246; *Hall* v. *Hall*, L. R., 14 Eq. Cas. 365; *Everett* v. *Everett*, L. R., 10 id. 405; *Wollaston* v. *Tribe*, L. R., 9 id. 44; *Coutts* v. *Acworth*, L. R,, 8 id. 558; *Cooke* v. *Lamotte*, 11 Eng. L. & Eq. 26; *Hoghton* v. *Hoghton*, id. 134.

I think the evidence shows that the property in Nassau street was, at the time of its transfer to the defendant, worth much more than the incumbrances upon it. It is contended by the defendant, that his title to this and the Cayuga and Wayne counties property is protected by foreclosures of the mortgages which subsequently took place. But I do not see that these foreclosures can avail him for any such purpose. They seem to have been, all of them, suggested, if not procured, by the defendant himself, for the purpose of giving such additional strength as the title derived under them might furnish. But, in addition to this, they, after all, do not place the defendant in any different position or relation than he occupied before the foreclosure took place. He is not a *bona fide* purchaser, without notice of the claims of the plaintiff' or of the defects in the title, but simply has acquired the incumbrances, and has the right, perhaps, to stand in the place of the mortgagees, holding liens upon the property until the mortgages are paid. Beyond this, he only holds for what it is worth, the legal title which he derived from his brother.

There cannot be a doubt that the utmost good faith was due from this defendant toward his enfeebled brother. In no relation is such good faith more necessary than between partners, and at no time more absolutely than when one is retiring at the urgency of, and upon the faith of representations made by the other. " *Ad cujus igitur fidem confugiet,*" said Cicero in his Roscian oration; " *cum per ejus fidem læditur cui se commiserit.*" It is a case, too, where, from the relation between the parties, the existence of domination and influence will be implied. The law does not limit itself by any arbitrary classification of such cases. Whenever the facts show a relation of blood, business, or intimacy, which confers power on the one hand and imposes submission on the other, the stronger cannot deal with the weaker, without proving the righteousness of his acts. *Dent* v. *Bennett*, 4 Myl. & C. 273 · *Hunter* v. *Atkins*, 3 Myl. & K. 113; *Harvey* v. *Mount*, 8 Beav. 439; *Lyon* v. *Home*, L. R., 6 Eq. Ca. 655; *Sears* v. *Shafer*, 1 Barb. 412.

The defendant has failed to justify his part in these transactions. But the case is not left here, for the plaintiffs have made out that the transfer and conveyances to the defendant were procured by the exercise of an influence which Nathan C. Platt could not at the time resist; and they were based upon representations, and upon promises of future advantage to the failing man and his family, which were untrue, and in the view of equity, fraudulent.

It is argued that the plaintiffs and their testator have been guilty of laches and delay which is fatal to their case. But it is not shown that the defendant has done or omitted any thing by reason of the delay, or that he is in any different position in consequence of it. He has simply enjoyed the fruits of his wrongful acts for several years. If he is called to account and to restore this property, he will be left where he was, and will lose nothing but the fruit of an unrighteous gain. He will lose nothing but the excessive profits gained out of his brother's property, in a way in which he ought not to have made them. I cannot agree to a doctrine which will close the gates of justice to a party who has been injured, before the time when the law bars his entrance, when there is nothing but delay shown, and when neither acquiescence nor injury from the

Platt v. Platt.

*James Emott, Charles Tracy and William Martin,* for respondents. The burden of proof is upon the party taking such transfers. 6 L. R. Eq. 655; 14 id. 365; 4 id. 30; 7 L. R. Ch. App. 244; 11 Eng L. & Eq. 26; 14 id. 134; 8 L. R. Eq. Ca. 558; 9 id. 44. The relation of partnership bound the defendant to the most entire and abundant good faith. 10 Hare, 493, 536; 2 Lindley on Partnership, 943; Finch, 431; 1 Sim. 89; Taml. 45; Collyer on Partnerships, § 178; 14 Beav. 250; 2 De Gex & J. 186; 3 S. & G. 419. The undue influence is sufficiently proved. *Hall* v. *Hall,* 1 L. R. Pro. & D. 481. Defendant must show that his brother fully understood the nature and consequence of his acts, and made the transfers freely and without pressure, influence or domination of defendant; that he placed his brother in possession of every fact known to him; that his brother had independent professional advice, and that the full and fair value of the property was paid to him by defendant. 1 Barb. 408; 2 Seld. 272; 5 Barb. 533; 35 N. Y. 592; 34 id. 167; 3 Cow. 538; 1 Sto. Eq. Juris., ch. 6, § 238; 14 Ves. 203; 2 White & Tudor's L. C. in Eq. 504 and notes; 31 Leav. 80; 4 Myl. & C. 269; 3 Myl. & K. 145; 11 Beav. 227; 8 id. 439; 28 id. 659; 2 Gill. (Md.) 83; 1 L. R. Ch. App. 252; 6 L. R. Eq. Ca. 655; 58 Barb. 643. If both parties were *in delicto,* they were not *in pari delicto,* 16 N. Y. 285; 35 Beav. 209; 9 Mar. L. 348; id. 461. The deeds were obtained by using the fears of the brother and imposing on his enfeebled state of mind and body, and should be canceled. 1 L. R. H. L. App. 200; 6 H. L. C. (Clark) 249; 180 Ves. 378; 26 N. Y. 9. The foreclosures were

lapse of time is shown. If delay has misled the assailed party and worked him positive wrong; if it has led to such a change of the position of property or persons, that it would be a plain wrong to interfere, or if it has been such, and accompanied by such acts, as to indicate distinct acquiescence, the court may hold the party estopped. But until it comes to that, the only limit is the limit of the statute.

There must be a judgment, declaring the release and conveyance by Nathan C. Platt to the defendant of his interest in the partnership property, executed July 2d, 1861; the conveyance of the property in Maiden lane and in Liberty place, and of the Cayuga county lands, null and void; also declaring the deeds of Nathan C. Platt's individual property in Cayuga and Wayne counties, and of his property in Nassau street, New York, void.

The partnership is to be considered as dissolved, from the 23d day of May, 1861, and an account must be taken of the interest of these parties, as of that time. The defendant must be allowed all payments made by him upon the real estate, in good faith, for repairs, improvements, taxes, insurance and payment of incumbrances. He will be charged with the rents and profits which he has received.

A reference is ordered to state these accounts, and upon the coming in of the referee's report, final judgment for the plaintiff, with costs, will be granted.

Findings and an interlocutory judgment can be submitted by the plaintiffs' attorney, upon four days' notice. If the parties do not agree upon the referee, the appointment will then be made by the court.

collusive and do not alter the position. 2 White & Tudor's L. C. in Eq. 544; 15 Sim. 437; 15 Beav. 551; 10 Hare, 261. There has been no laches by plaintiffs. 1 Sug. on Ven. 387 (8th Am. ed.), note; 20 Johns. 38; 6 Madd. 26; 2 Mac. & Gor. 146; 2 Kay & J. 1; 2 Sch. & Lef. 632; 1 De Gex & J. 78; 49 N. Y. 326; id. 336; 2 M. & K. 674.

BARRETT, J. This is a motion for a new trial under § 268 of the Code, as lately amended. It brings up before final judgment the question, whether the findings of the special term were justified by the evidence, and necessarily involves the consideration of the whole case, both upon the facts and the law.

The suit was brought by the executors of Nathan C. Platt, to set aside certain transfers of property, made by him, in the years 1860 and 1861, to his brother, the defendant.

These executors are the children of Nathan C. Platt, and they charge that the transfers were procured by fraud and misrepresentation upon the part of the defendant, and by means of undue influence, which they assert that he exercised upon their father.

These charges are denied by the defendant, and upon the issues thus raised, there was a trial at the special term that resulted in the decision and judgment in favor of the plaintiffs, which is now under review.

The intimacy between these brothers was close and life-long. Prior to the transfers in question, they had been partners in business some thirty years, the defendant being the head of the house, and nine years the senior. Both were active, energetic and industrious. There were two separate departments in the business; one was importing and dealing in watches, etc., which was carried on at No. 20, Maiden lane, under the superintendence of Nathan, and the other was a gold and silver refinery, established at Nos. 4 and 6, Liberty place, and conducted principally by the defendant. Nathan's sons assisted him in the mercantile business, while the defendant's sons and son-in-law occupied themselves with the refinery.

There being, as was quite natural, perfect confidence between the brothers, neither troubled himself to become acquainted with the details of the department conducted by the other. Matters thus seem to have gone on smoothly and prosperously until, in what was certainly for Nathan an evil hour, he launched into enterprises outside of the regular business of the firm.

He became president of the Artisans' Bank and city chamberlain.

Platt v. Platt.

With rare assiduity he fulfilled the various public and private duties thus assumed, including morning and evening visits to the mercantile establishment, until the latter part of the year 1860, when disasters set in; he then ceased to be chamberlain, the public funds were removed from the Artisans' Bank, and the failure of that institution speedily followed.

During the preceding summer he had been unwell, and had lost much of his old vigor and robustness, while later, in the struggle to sustain his bank, he passed through much excitement and trouble, suffering the anxiety and undergoing the mental wear and tear incident to such a crisis. It was to the intensity of this strain that he himself attributed the disease with whith he was attacked at a later period, and he declared to one of the witnesses that "one night during the troubles, he had walked the floor of the Artisans' Bank all night," and that his efforts to make good his city account "had killed him, and broken him down." He bore up, however, until these troubles culminated in the final catastrophe, and then he sank, it is not too much to say, helplessly and hopelessly, declining slowly but steadily both in mind and body, until July, 1863, when he died. The testimony upon this head is full and abundant. It is true that after his illness began he occasionally visited the mercantile establishment, gave a few orders, wrote letters, signed checks, and even transacted some private business; he was never, in fact, *non compos mentis*, within the legal signification of that term, as applied to testamentary disposition. But it is equally true that his mind became so weak as to render him an easy victim to any designing man, and that his credulity, as evidenced by his own diary, was amazing; he was in just that dangerous condition of mind for which the law makes no provision, because the individual is yet within the confines of its definition of sanity; but which equity guards with her just and benignant rules. In this very diary, for instance, he narrates events indicating a perfect child-like faith in the most improbable and transparent and improbable statements of one Plin White, and yet he pens them with an accuracy and precision, carried into the minutest details, worthy not only of the most careful and prudent business man, but of one gifted with a memory sufficiently retentive almost to photograph the scenes depicted.

It is quite evident that the failure of the bank preyed upon his mind, broke him down physically, mortified his pride, crushed his spirit, and superinduced the fatal disease under which he finally

succumbed. The witnesses draw a sad picture of his declining days. In the spring of 1861, he took to his room, and never again left the house. Speaking of his physical condition, they say that he "steadily grew worse," that he was "weak," "exceedingly nervous," "constantly fading away," "suffered a great deal from sleeplessness," and also from pains in his feet, so much so that he could not bear a stocking or sheet to touch him," and that his physicians termed his disease "diabetes," which afterward ran into consumption; the latter finally "carrying him off."

With reference to his mental state, they say that his disposition became "very changeable;" that much of the time he was under "great mental excitement," sometimes "brooding," sometimes "weeping," over his troubles; that he would very frequently "go around the room crying," and "seemed at times as if he did not know what to do with himself," again he would be "almost in a stupor," then "vacillating," "fretful," "despondent," "melancholy," some days cheerful and hopeful of again returning to business, then despairing and perfectly hopeless. They further prove that he had "all sorts of whims and queer ideas;" that he showed one of his sons an advertisement in a newspaper, saying, "perhaps I can make "one thousand dollars by investing ten dollars, I wish you would go and see about it," and although his son has promised to do so, never again recurred to the subject; that he asked another of his sons to get him opium to make him forget his troubles, and when it was procured, permitted the package to remain undisturbed; "very soon he forgot all about it;" that he had his old papers and accounts, books and letters brought to him, and that he used to have them on his desk, on his bed, and "strewn all around the floor," spending days looking over them, "apparently with no object at all;" "he seemed," says one of the witnesses, "to have a great hobby for figuring up things."

The illness and death of his wife added to his affliction and nervous exhaustion; during her last illness, his son, Nathan, says that he was "as near to a crazy man as you could come, and not be crazy; he would walk the floor wringing his hands and not sleeping any."

It was at this time, when his wife was dying in the adjoining room, and he himself was in the condition described by the witnesses, that the final transfers of his partnership and individual property were completed.

The partnership interests were conveyed upon the 2d of July, 1861, the individual real estate in Nassau street, upon the fifth, and his wife died upon the seventh of the same month.

This brings us to the consideration of the extent and condition of Nathan's property and business affairs, at the date of the failure of the Artisans' Bank, which occurred about the 1st of October, 1860, and to the conduct of the defendant with respect thereto.

The brothers were equal partners; Nathan having an equal one-half interest in the refinery as well as in the mercantile business; also in the real estate and premises in Maiden lane and Liberty place, where these departments of the business were respectively carried on; also in a house and lot on Second street in this city; also in a lot in Buffalo, and a farm in Cayuga county, in this State, and also in certain lands in the States of Vermont, Michigan, Iowa, Minnesota, Mississippi and Texas. Individually he owned the parcel of land with the buildings thereon, known as Nos. 119 and 121 Nassau street, in this city, and also certain farms and lands in Cayuga and Wayne counties, in this State.

Nathan's interest in the firm appeared to amount, by the balance-sheet of February, 1860, to $221,097.51, and by that of February, 1861, to $177,791.87.

The Nassau street property was found, and upon sufficient evidence, to be worth $125,000. It was mortgaged to the amount of $72,426.01, with some unpaid interest, leaving an equity of about $50,000; the Cayuga and Wayne county lands were variously estimated at from $75 to $150 per acre, according to location.

If these balance-sheets represented any thing like the true value of Nathan's interest in the firm, and there is no just reason to doubt that they did, and even if the plaintiffs' witnesses considerably overestimated the value of the Nassau street property, and the Cayuga and Wayne county lands, still Nathan must have been worth, upon a reasonable and moderate view of the evidence, at the time of the failure of the Artisans' Bank, not far from a quarter of a million dollars. By the transfers which have been set aside, this entire property was acquired by the defendant without the payment of a single dollar. The only consideration which it is pretended that Nathan received was the sum of $1,034.60, and there is no sufficient evidence that even that amount was actually paid.

The dates of the transfers were as follows:

1. October 18, 1860. All Nathan's interest in the refinery busi-

ness. This was effected solely by entries upon the partnership books.

2. October 20, 1860. All Nathan's interest in the Maiden lane and Liberty place real estate. Effected by formal deeds.

3. July 2, 1861. All Nathan's right, title and interest in the business, and in the remaining joint interests. Effected by a formal instrument reciting the consideration of $1,034.60.

4. July 1, 1861. The individual Cayuga and Wayne county lands.

5. July 5, 1861. The individual Nassau street property.

The transfers numbered "four" and "five," were effected by conveyances confessedly voluntary and without consideration.

It is claimed that whatever the court may think respecting the conveyances of 2d and 5th of July, 1861, those of the preceding October must be sustained. It is argued, that, as to the latter, there is no direct evidence of undue or improper influence; that Nathan had not sunk so low, either physically or mentally, as to weaken or impair his full contracting powers; that it is in evidence that he himself, as well as the defendant, directed the book-keeper to make the entries whereby the refinery was transferred, and that these transfers were for a full and adequate consideration.

It is true that there is no such direct evidence of pressure, influence and threats, with respect to the October transfers, as we find when considering those of the following July; but the fallacy of the argument consists in treating each conveyance separately, and as a transaction independent of and disconnected with the other; whereas, an examination of the whole case makes it clear that they should be viewed as an entirety, and considered as part and parcel of the one transaction, by which the defendant acquired substantially the whole estate of his brother.

If direct threats were made, and undue influence used to procure the July transfers, such threats and influence plainly characterize the earlier transaction. The evidence of this unity of purpose and design runs through the case.

It commenced when the failure of the bank was imminent, and took the form of the defendant's anticipating large liabilities and judgments against Nathan, and the expression of a desire on his part to sever the business connection, and to protect his brother's property and interests. This the defendant substantially admits; he expressly admits that "on all occasions the simple idea

was, that it was necessary for me to dissolve with my brother in consequence of his embarassed condition ; " and, when asked if he had stated to William H. Platt that he expected "large judgments against Nathan," that he " wanted to have the whole thing in his own hands, and have absolute control of it, and that, unless this was done, the business would be stopped, and people come in to examine, and all that he wanted to avoid ; " he replied, that there was "something to that report, though not of such an extended character."

The danger to be apprehended from his brother's creditors, both to Nathan, individually, and to the firm business, and his desire (in absorbing all) to protect both for the sake of Nathan and his children, was the ground-work of all that followed, and the key-note of the defendant's success.

It secured as his allies Nathan's children, who believed both in the apprehended danger, and in the promise of protection, and thus withdrew from Nathan the disinterested support and protection of his three grown sons. It enabled the defendant to act with perfect openness, lulled all suspicion, and insured the co-operation of the book-keepers and employees of the firm, and all who were friendly to Nathan and his family. As one of them testified, " We all concurred in the necessity of the thing under the circumstances."

The sons were won over by such language as this ; " he began telling me," says William H. Platt, " the trouble my father was in, the amount of debts he owed, and the judgments probably coming upon him. He was figuring up, and estimated the amount as something over $200,000, putting in all the mortgages on his real estate, and he remarked the property would probably bring nothing. There would be a large judgment for deficiency, and others would follow, and every thing would be swept away, and he wanted the property all placed in his hands, all turned over to him, and in order to stand, it must be a *bona fide* transaction. He said he would take all, and after the trouble was all over, he would account for it, and it would come back to us, as a donation."

Two facts will be noticed in this connection. The first is, that the apprehension of danger was illusory, as the sequel proved. It is true the Artisans' Bank involved Nathan in some litigation, but he defended himself without doubt as to the result, and in the end he was substantially successful, and, in effect, relieved from all liability. Indeed, Nathan's troubles never proceeded from the fear of con-

sequences, but entirely from the mortification and discouragement consequent upon the failure of the institution over which he had presided, and for the success of which he felt himself responsible, At one time he expressed himself decidedly upon this point, and declared that there would be no difficulty, if his brother would only stand by him to the extent of a few thousand dollars.

The other fact is, that according to the defendant's present theory Nathan's property and interests were of no value whatever, and in fact, there was nothing for creditors to reach, nor for him to "protect."

In view of such facts there would seem to be no rational explanation of the defendant's course, except upon the theory that the apprehension of immediate danger, if believed in at all, was greatly magnified, and, at all events, was put forward as the means, in connection with the promise of protection, donation, etc., to effect the desired end.

But, even as an independent transaction, the October transfers could not be upheld. Partners may, of course, as the learned counsel for the defendant insists, make any contract they please, as between themselves, for the purchase or sale of the whole or any part of the firm property. But there is no evidence that these transfers were the result of any such contract. The Maiden lane and Liberty place real estates were taken by the defendant, at prices so inadequate as to preclude any such idea; and for the refinery, the defendant was charged an amount not only inadequate in itself, but evidently fixed without proper investigation. The claim of a deliberate contract, based upon a full and adequate consideration, is unfounded both upon the testimony of the witnesses, and the facts, not in dispute, with respect to the books.

A regular set of books was kept in the mercantile, but not in the refinery, department. We have seen that the latter establishment was under the exclusive superintendence of the defendant, and that Nathan knew little or nothing about it. In answer to the charge of loose management, the defendant claims that the transactions in bullion "closed themselves up, and required no complicated set of books."

However that may be, the only record of the refinery transactions, contained in the regular firm books, consisted of an annual balance taken from the inventory sent in by that department in the month of February of each year. These inventories were on loose sheets,

and were not retained after the general result had been transferred to the refinery account in the regular firm books. Such books as were kept in the refinery, a cash and some memorandum books, were demanded upon the trial, but the defendant declined to produce them, and neither of the persons who kept such books was called as a witness. Without considering other charges of fraud made by the plaintiffs in this connection, namely, in the drawing of moneys by the defendant from the refinery, which the plaintiffs assert were not stated at the end of the year as assets of the firm, enough has been shown to indicate the impossibility of accuracy or precision in the sum for which the refinery was turned over to the defendant.

The rules governing such a transaction are well settled. In their dealings with each other, partners occupy a position of trust. They are held to the utmost good faith; a purer and more elevated morality is demanded of them than the common morality of trade, and the standard by which they are tried in a court of equity is far higher than "the standard of the world." *Blisset* v. *Daniel*, 10 Hare, 493, 536. These principles are peculiarly applicable to the case of a dissolution and transfer of his share, by the retiring member to his copartners. Equity will scrutinize such agreements closely and watchfully, and will not permit them to stand, if it can discover that they were brought about by concealment, unfairness, or other unconscionable conduct. *Maddeford* v. *Austwick*, 1 Sim. 89; *Clements* v. *Hall*, 9 De G. & J. 186; *Perens* v. *Johnson*, 3 Sma. & Gif. 419.

One member of a firm has no right to make use of his peculiar and exclusive knowledge of the state of the business, or the condition of accounts, to obtain advantage of his less informed partner. The vice-chancellor said in *Maddeford* v. *Austwick*, *supra*, that " the defendant, being the partner whose duty it was to keep the accounts of the firm, could not in fairness deal with the plaintiff for his share, without putting him into possession of all the information which he himself had, in respect to the accounts."

In this case there was no direct proof of any misrepresentation, and the vice-chancellor remarked, " it is, however, *to be inferred* that the defendant must have stated to the plaintiff that the terms proposed by him were a fair consideration."

The observation first quoted fully meets this branch of the present case. The defendant dealt with exclusive knowledge of the refin-

ery; Nathan, with nothing save the general result, which the defendant had thought it sufficient to have annually recorded in the firm books.

Under these circumstances, and in view of the other facts established by the plaintiffs, a *prima facie* case was clearly made out, and the burden of proof was shifted to the defendant. It became incumbent upon him to show that the transfer of the refinery was the result of investigation; that the consideration was fair and adequate, or, at least, that it was arrived at after Nathan had been afforded the same light which he himself possessed, and generally, that the agreement, to quote the language of the vice-chancellor, in *Lyon* v. *Home*, L. R., 6 Eq. 655, was the "pure, voluntary, well-understood act" of his brother's mind, "unaffected by the least speck of imposition or undue influence."

Nor can the claim of Nathan's full mental power at this period be admitted. His mind was dazed by the shock which it had just received, and against which it was never able to react. But two months later we find the first entry in the extraordinary diary to which reference has been made. Certainly he had not sunk so low, either physically or mentally, as when the July transfers were procured; but the difference was only in degree, and while it is difficult to draw the dividing line, or to measure the precise extent of his powers at any particular time, yet it can safely be asserted that at all times, from the failure of the bank until his death, this sick and broken down man stood in need of considerate and constantly increasing care, and of the wise, honest and affectionate guardianship of those who were near and dear to him. It would be quite natural for such a man, under such circumstances, to lean upon his elder and only brother, who had been the business partner of his life, and so far, at least, as his property and worldly interests were concerned, to look to him for advice, assistance and strength; and the influence at such a time, whether for good or evil, of the strong, well man, and the elastic and unimpaired mind, would necessarily be great and overshadowing. Upon the whole, we think that we are quite within bounds, in holding, upon this branch of the case, that at no time, after the failure of the bank, had Nathan the capacity to suspect the designs, or the energy to resist the will of the defendant.

If, therefore, Nathan himself directed the book-keeper to charge the refinery, and the Maiden lane and Liberty place property, to

the defendant, he simply yielded, without suspicion, to the defendant's will. The latter never spoke of these transfers as a purchase, never referred to them as the result of a bargain or contract.

He simply expressed his intention "of taking them to himself," of "taking the store property and the refinery, to protect them from Nathan's liabilities," a purpose quite consistent with the plaintiff's theory of undue influence, and entirely inconsistent with defendant's of an ordinary bargain, with a man of fair intelligence, upon an adequate consideration, and with full opportunity of inquiry and knowledge.

We now come to the consideration of the July transfers.

The yearly balance-sheet of February, 1861, has been referred to. In May, 1861, the defendant directed a fresh inventory and balance-sheet to be made up. This was with a view to the dissolution of the firm, and to the July transfers. At this time Nathan was at home sick, and the balance sheet was made out under the exclusive direction of the defendant.

It was prepared for the purpose of reducing Nathan's interest to the smallest possible figure, yet it resulted in showing $86,032.86 as still standing to his credit. The defendant was not satisfied with this, and expressed a determination to "wipe out" Nathan's interest altogether. He stated to the book-keeper that "Nathan must not have any thing to his credit at all, or nothing of any consequence." The result was the preparation of another balance-sheet, by which Nathan's interest was reduced to $1,034.60. This was accomplished by what, but for the defendant's public professions of sympathy with his brother, and the good intentions which he expressed regarding him and his family, would have been understood by every one concerned to be a deliberate fraud. It was done in this wise: One hundred shares of Artisans' Bank stock, which was owned by the firm, and had become worthless, was charged to Nathan. Moneys which appeared upon the books to be due by Nathan's sons were charged directly against their father. All the western and other lands of the firm were taken by the defendant, at low valuations. Twenty-five per cent was deducted from the cash value of the merchandise, which brought about an "estimated loss" of $45,183.76. The losses on the bills receivable were "estimated" at $25,720, on the open accounts at $95,437.97.

A great deal of very irrelevant and inconclusive evidence was taken at the trial, with a view of proving that a deduction of twenty-

five per cent upon the cost price of the goods would have been reasonable and proper, upon a sale, by the firm, of its entire stock, or upon a " dissolution between two partners, one of them taking the whole stock at a cash valuation."

The goods had been inventoried in the preceding February, at their cash value; but, apart from that, these deductions were not made upon consultation with Nathan, or in pursuance of any agreement between the partners. There was no question before the court of the reasonableness of any contract, unless a contract can be made by one person. The false charges and the deductions were made by the defendant, arbitrarily, and for the sole purpose of making it appear upon the books, and in the balance-sheet, that his brother's interest in the firm was worth little or nothing. The evidence is conclusive upon this head.

William H. Platt testifies, that after certain deductions had been made, the book-keeper showed the defendant something upon a slip of paper, whereupon the latter remarked, " that won't do ; he must not have any thing to his credit at all ; there must not be any thing to his credit, or nothing of any consequence."

And again, " he (the defendant) simply ordered it (the twenty-five per cent) off ; he found twenty-five per cent would effect his object, and he did that." Mayhew, the book-keeper, testified to the defendant's declaration, that " it was necessary that Mr. Nathan C. Platt's interest should be made as small as possible," and he thought the expression was used, " that Mr. Nathan C. Platt must be wiped out of the concern entirely."

Spencer C. Platt heard the defendant say, " that Nathan's interest was too large ; it must be still further reduced."

Nathan, Jr., saw the book-keeper show the defendant a slip of paper, and heard the latter exclaim, " the devil! that won't do; that is entirely too large; it must be cut down."

Some of this the defendant denies ; but the weight of evidence and the surrounding circumstances are clearly against him. The expressions testified to by Mayhew are scarcely denied by such testimony as this :

" Q. You never used the expression 'wiped out ?'

" A. I *don't think* I did ; it is not a term I use."

Nor such as this :

" Q. Mr. Spencer C. Platt testified to several conversations in which you use the expression that ' Mr. Nathan C. Platt's interest

Platt v. Platt.

must be wiped out or made as small as possible; did you ever make use of any expression of that kind ? ' "

"A. *Not as regards the smallness;* the idea of an entire separation of my interest from Nathan's, I expressed and thought."

Even Nathan was roused to a temporary and feeble resistance to the execution of the final transfer, which was based upon this last balance sheet; the story of its execution is told by Nathan, Jr., as follows:

" Q. What did Mr. George W. Platt say or do about that paper; did he have that signed in your presence ?

" A. On the 1st of July, 1861, he came to the side door and said, ' Nat, I want you to go up to your father and have this paper signed;' he said it was a very strong paper, and appeared to be very much pleased about the paper being so strong, and said the creditors could not come in to rip that up; he wanted me to go up and have it signed, and he could sign it, and I could witness both signatures.

" Q. What did you do?

" A. I went up to the house and returned in about two hours with the paper unsigned, and told him that father would not sign it; that he did not see any use in signing it; that if his brother would stand by him with a few thousand dollars, he could save all his property and get out of his trouble; Mr. Platt said my father must be crazy, that the creditors would strip him of every thing, and he would see Nathan about it; that afternoon he went up, and returned between half-past four and five o'clock, and said he had seen Nathan and had a terrible time with him; he was obstinate, strong headed, and he would not do it, until he threatened to cut him off as a brother and give him further trouble, and father then consented to sign it; on the following day, Mr. George Platt and myself went up together, in the cars, and went to my father's room; he was in bed; I assisted him to his chair, and when we were in the room George said, ' well, Nathan, we have come to have that paper signed;' father took a pen and signed it, and said, ' There brother, I hope that will satisfy you,' and he cried doing so; George said, ' Nathan, that is for your benefit; that is the last of your trouble;' we left the room together."

This is partially corroborated by William, as follows:

" Q. Now tell what passed between him and you; what he said then and afterward, until the paper was signed; narrate what occurred, in its order, as you now recollect it ?

" A. After he showed it to me, he said he would send my brother

up to the house to have it signed; I saw my brother leave the store that afternoon.

"Q. You say you saw him leave the store that afternoon?

"A. I saw my brother leave the store to go up.

"Q. With a paper?

"A. To go up with a paper to have it signed. Late in the afternoon, my uncle, George W. Platt, came to me, seeming very much excited in his manner, saying he just had a terrible time with my father; that my father was wild and crazy, and he did not want to sign it; that he had a terrible struggle to get him to consent to make these transfers; he had to tell him plainly, that unless he did so his family would be ruined, and more than that, he said, 'Nathan wanted me to promise to give it all back to him, and I did promise to do so.'

"Q. These remarks he made before or after the paper was signed by your father?

"A. Before the paper was signed; he went up in the afternoon to see him about it; to get his consent to signing it.

"Q. This was after he came back that afternoon?

"A Yes.

"Q. Go on and tell any thing further he said about it?

"A. These remarks were made in the afternoon; he said he had this terrible struggle with my father to get him to do this, and he finally got him to consent to make these transfers, by promising him to give it all back to him; that he did so to save his family from being ruined; it was necessary for him to do so."

This is testimony, which, if true, characterizes the entire conduct of the defendant, and is decisive of the case. It would be impossible for any right-minded court or jury to hear such testimony and to give it credence, without feeling pity for the one and indignation against the other of the actors in this unhappy scene.

We have, therefore, analyzed the defendant's denials with care, and we regret to say, that they are by no means unqualified, as claimed by his learned counsel. The language of Nathan, Jr., which we have quoted, was repeated to the defendant, and he was asked if any such scene occurred. His answer was as follows:

"I think there may be something in it, not regarding that paper at all; there was another paper which there was some trouble about getting signed, but these papers, these dissolution papers there was no trouble about.

" Q. Is that true in reference to the partnership paper?

" A. It is not true.

" Q. Do you recollect any paper, in reference to which there was something of that kind occurred ?

" A. I do; there was some trouble, some hesitancy on his part to signing a paper which was a lease on the Second street property there."

Now, it will be observed, that the scene itself is substantially undenied, but transferred to another and unimportant event.

The Second street property was inventoried at but $2,600, and the question of a lease must, therefore, have involved a very insignificant sum. The criticism is irresistible.

Would Nathan have cried about so trivial a matter? Would he have said, " there, brother, I hope that will satisfy you?" Would the defendant have replied, " Nathan, that is for your benefit; that is the *last of your trouble?*"

Further, it appears that this Second street lease was not signed nor executed in the defendant's presence at all, and was not the subject of any trouble, objection or hesitancy, for the defendant himself put in evidence Nathan's letter to him, of June 28, 1861 (four days *before* the final transfer in question), in which Nathan says, " Dear brother : I *send you* herewith all the papers you left with me for signature and acknowledgment, except three. One relating to the lease of Second street, *I have signed and acknowledged,* and sent to the register's office to be recorded."

It is but too plain, therefore, that the sad story told by Nathan, Jr., is the truth of the case.

It is unnecessary to consider the circumstances attending the later conveyances, as they were confessedly voluntary, and made so shortly after the scene which has been described, as to bring them clearly within its shadow. We may say, however, that in none of the transactions had Nathan the benefit of legal advice; and we have seen that those about him had been induced by the defendant's plausibility to believe in the justice and wisdom of all his plans. Thus Nathan was completely subjected.

The voice with which he gave the book-keeper his directions, in October, 1860, was but the echo of his brother's voice. The hand with which he signed the dissolution of May 23, 1861, the approval of the statement of the account, and the final transfers, was, to all intents and purposes, the hand of the defendant. The means

adopted were the creation of unnecessary excitement, apprehension and alarm; the cry of danger, which was illusory and fictitious; the making of pledges, which were false; the manipulation of balance-sheets, which were fraudulent; and, finally, downright threats, intimidation and domination of an unusually cruel and heartless description.

The end sought was the complete spoliation of Nathan, and it was accomplished.

The equity rules applicable to such a state of facts were correctly laid down by the special term. They were, if any thing, understated. So far as the conveyances, which were confessedly voluntary and without consideration, are concerned, the burden was upon the defendant of proving that the transaction was fair, proper and righteous, and that Nathan's acts were "acts of rational consideration, of pure uninfluenced volition." *Coutts* v. *Acworth*, L. R., 8 Eq. Cas. 558; *Hoghton* v. *Hoghton*, 11 Eng. L. & Eq. 134; *Wollaston* v. *Tribe*, L. R., 9 Eq. Cas. 44. Ordinarily, and where there are no intimate or peculiar relations between the parties, this proof is given, if it be shown that the donor thoroughly understood what he was doing, and was protected by independent advice. *Phillips* v. *Mullings*, L. R., 7 Ch. App. 244; and *Hoghton* v. *Hoghton*, *supra*.

"If, however," as was observed by the Master of the Rolls, in *Hoghton* v. *Hoghton*, *supra*, "besides obtaining the benefit of this voluntary gift from the donor, the donor and donee were so situated toward each other, that undue influence might have been exercised by the donee over the donor, then a new consideration is added, and the question is not, to use the words of Lord ELDON, in *Huguenin* v. *Basely*, 14 Ves. 273, whether the donor knew what he was doing, but *how the intention was produced;* and though the donor was well aware of what he did, yet if *his disposition to do it was produced by undue influence*, the transaction would be set aside."

This latter doctrine proceeds upon different principles from those applicable to cases of strict trust.

Where the technical relation of trustee and *cestui que trust* exist, the law will not permit the former to bargain personally with respect to the trust estate, and declares such bargain, however pure as a matter of fact, to be fraudulent as a matter of law. This arbitrary but wholesome rule is founded upon reasons of public utility, viz.: To preclude the possibility of advantage being taken by the trustee of the position which he occupies.

The defendant was not, as is now claimed by him, held to any such rule.

He was simply held to the rule which governs, as between donor and donee, in cases of voluntary conveyances, and as between grantor and grantee, in cases where the facts and circumstances " imply the exercise and dominion of influence " over the grantor's mind. Notwithstanding the overwhelming evidence bringing this case within the latter category, the defendant did not attempt to repel the presumption thus created; nor did he offer a particle of evidence tending in the remotest degree to establish the righteousness of the transaction, nor even that the grantor fully comprehended what he was doing.

The relation of blood and that of trust growing out of the partnership were dwelt upon, not as bringing the case within the category of technical trusts, and the rules appertaining thereto; but as indicating, when taken in connection with Nathan's feeble state, and the other facts of the case, a relation which implied the existence of dominion and influence, and which called for proof of the purity of the transactions.

Equity classifies the cases where bargains will be set aside as a matter of law, but never where fraud or undue influence is charged as a matter of fact. *Dent* v. *Bennett*, 4 Myl. & Cr. 269. Relief will never be denied, merely because the elements of some well-defined trust or fiduciary obligation are wanting.

" I will not," says the learned judge, in *Dent* v. *Bennett*, *supra*, "narrow the rule, or run the risk, in any degree, of fettering the exercise of the beneficial jurisdiction of this court, by any enumeration of the description of persons against whom it ought to be most freely exercised."

The jurisdiction, in fact, is wide enough to bring within its area all who come within the definition of " subjugater," and " subjugated," and the existence of intimate relations, whether of blood or partnership, or otherwise, may always be shown as bearing upon the question of influence and dominion.

Our conclusion is with the plaintiffs, in both aspects of the case. Assuming the burden of proof to be upon the plaintiffs, they have affirmatively established the existence of undue influence. They

have, therefore, established the lesser facts, from which the exercise of dominion and influence are implied, and which shift the burden of proof upon the defendant.

The latter has neither answered the demand for such proof, nor has he attempted to meet what has been affirmatively established.

He protests that his lips are sealed by the rules of evidence, and that he is not permitted to disclose what took place between his brother and himself. In this he is not prejudiced, for his brother's lips are likewise sealed. It was the defendant's duty to have been prepared for such a contingency. As was said in *Dent* v. *Bennett,* above cited, " Of such a case, it may at least be said, in the language of Lord ELDON, in *Gibson* v. *Jeyes,* 6 Ves. 266, that those who meddle with such transactions take upon themselves the whole proof that the thing is righteous."

As was also said by Judge PORTER, in *Tyler* v. *Gardiner,* 35 N. Y. 592, in considering a case of undue influence, used to effect testamentary dispositions: " *It behooves such beneficiary to be provided with evidence,* that the instrument expresses the honest and spontaneous purposes of the person who is called upon at such a time to reverse the provision of a previous testamentary disposition, made in health and strength, in favor of those having clear claims upon the justice and bounty of the testator."

The learned counsel for the defendant, upon the argument, expressly disavowed any charge against Nathan of having made the conveyance in question with the intent to defraud his creditors, or any claim to retain the property, under the rule with respect to parties *in pari delicto.* By this, we understand, that if the inevitable logic of the case had brought us to such a conclusion, the rule was not to be invoked as a bar to the restoration of the property. It will not, therefore, be necessary to discuss the question as to whether, upon the theory of an intent to defraud creditors, the parties were really *in pari delicto.* But apart from that, as a matter of fact, neither party had any such intention.

So far as the defendant was concerned, his suggestion upon that head was, as we have seen, a mere *ruse* to alarm and win over Nathan's sons and the employees of the firm. As to Nathan, all the evidence shows that he neither feared his creditors, nor thought of defrauding them; and when he was required to sign the instrument which would have been most important in effecting such a purpose, he struggled and resisted, until overcome by the defendant.

A point was made with respect to a part of the real estate which should be averted to. It was, that as the mortgages thereon were foreclosed, and the properties purchased by the defendant upon the sale, a new and independent title was thereby acquired, freed from any of the previous defects. The difficulty with this position is, that, as a matter of fact, these foreclosures were procured by the defendant, and were but a part of the general scheme, which has been discussed and found against him. The defendant's denials, from what we have seen as to other parts of his testimony, and the weight of evidence upon the other side, cannot avail him.

Without examining the evidence in detail, it will be sufficient to look at that bearing upon some of the more important of the properties, viz., that in Nassau street, in this city, and in Cayuga county, in this State. Mr. Murdock, the mortgagee of the Nassau street property, had an interview with the defendant, prior to the foreclosure, in which he says, that the defendant "wanted him to have it foreclosed, and said that he, the defendant, should buy it, unless it went at too high a figure." The following question was put to Mr. Murdock, upon cross-examination, eliciting the following answer.

"Q. Would you have foreclosed any way, if the interest was not paid, without reference to any suggestion from Mr. Platt?

"A. I should not, because Mr. N. C. Platt was sick, and I was friendly with him; I might have waited until I came on the next time; I did not want the money."

William H. Platt also testifies as follows :

"Q. You said something about the foreclosure of the Nassau street property?

"A. Yes.

"Q. Did Mr. George W. Platt have any thing to do with it?

"A. Yes ; he did; he started it to have it foreclosed.

"Q. Was the purpose of his doing it declared at the time ?

"A. He said it was to get a better title to it.

"Q. Were there foreclosures of the Cayuga county property ?

"A. Yes, several of them.

"Q. What do you know about the procurement of them ?

"A. I know that he started all of them ; they were carried on by his direction.

"Q. The title was standing in his name all the while ?

"A. Yes.

" Q. When the sale took place, what did he do about them ?

" A. I know that he sent me up there to attend to one sale, the 50 acres, which was sold on foreclosure. He told me that Mr. Wing, who held the mortgage, would be there, and it was all arranged with him to go up there and bid and buy, so that he could get the property; his object was to keep it in such a shape as to be perfectly safe.

" Q. Did you go up and bid for him ?

" A. I did. There was no one there but Mr. Wing, Mr. Pingree, who acted for my uncle as his attorney, and myself. It was struck off to George W. Platt.

" Q. Mr. Pingree was the attorney who procured the foreclosure ?

" A. Yes.

" Q. He was employed by Mr. George W. Platt ?

" A. Yes; it was all arranged ; we went to the court-house together."

It was quite unnecessary for the defendant to add the expense of a foreclosure sale to the amount due upon the mortgage, unless he had doubts in his mind or conscience as to the validity of the voluntary conveyances under which he held. The foreclosures were plainly collusive, and the defendant acquired no better title thereby. It was a change in form, but not in substance. In such a case no device will be permitted to stand between the injured party and his just rights, and neither he nor his legal representatives will be prevented from following the property, except in the case of a *bona fide* purchaser, for value and without notice.

It was also claimed that the present was a stale demand, and was barred by reason of the plaintiffs' laches.

There is no rigid or inflexible rule by which such an action is barred for any delay less than that specified in the statute of limitations. Within that limit the question is one of estoppel or acquiescence. Here there is clearly no evidence upon which to apply the rules governing an *estoppel in pais*. Indeed, it is quite plain that the defendant has lost nothing, nor suffered in any particular from the delay.

As to acquiescence, that is a question of fact, depending upon the peculiar circumstances of each case. The plaintiffs, as individuals, were almost as much in the defendant's power, after their father's death, as the latter had been when alive; they found themselves

poor, and dependent upon the defendant. They were in no condition to quarrel with him. Their eyes were not opened to defendant's intentions, until after their father's death; and although from the defendant's refusal, shortly after that event, to pay the interest upon their house, they knew, as they say, "that they must look out for themselves;" yet there is no reason to believe that they fully realized the previous conduct of the defendant, until a much later period; even after they had a full comprehension of its real meaning they were a long time in obtaining the necessary evidence to justify them in taking a stand against so wealthy and powerful an adversary. The books were examined with great difficulty, and the extracts were numerous, occupied much time, and had to be taken stealthily. We are of opinion, upon all the evidence, that acquiescence has not been made out, either expressly or by legal implication.

Some questions were raised as to the admission of evidence. The first was with respect to the admission of the diary, which has been referred to; this diary was clearly admissible, as tending to show the condition of Nathan's mind; it was a daily record made by himself, during the largest part of the very period which was the subject of judicial investigation; the state of his mind was stamped upon every page, and more reliable evidence was thereby afforded of the secret workings of his brain than could be expected even from eye-witnesses. The envelope and checks were not, as we understand it, admitted for the purpose of verifying the truth of the diary, but as additional and contemporaneous memoranda, made by Nathan, in connection with the diary, and are, in substance, a part and parcel of this record of his mental condition.

If it were otherwise, they did not prejudice the defendant, for it would be difficult to say whether the weaker intellect is indicated by the verification of the facts so circumstantially narrated, or by their treatment as entirely imaginative.

It is claimed, also, that the court admitted oral evidence to establish a trust for Nathan or his family, and that this was error. No such evidence was admitted; the plaintiffs did not seek to establish a trust, but fraud and undue influence; and the fraud and undue influence alleged were not in refusing to carry out as a trust. The promise of protection and restitution made to Nathan's sons were mere incidents in the defendant's general scheme. For the purpose of establishing that general scheme, it is plain that all the defend-

ant said and did from the beginning to the end was admissible, including, of course, the honeyed words whereby Nathan's sons were deluded; and the question to be then determined upon all the evidence was, whether a case of fraud and undue influence was made out?

Some minor questions of evidence are touched upon in the briefs, but they are unimportant, and we think the questions were correctly decided.

With respect to these questions, as well as to those which have been discussed, we may, in conclusion, refer to the well-settled rule that in equity cases new trials will not be granted, unless it very clearly appears that undoubted injury has been done by the admission of the objectionable testimony. The court will always look at the entire case and see whether substantial justice has been done; and where that appears, it will affirm the judgment, notwithstanding the admission of testimony, which, in ordinary actions at law, might have necessitated a new trial.

In the present case there is no question, in our minds, that the judgment of the special term was just and righteous, and that it ought to be sustained.

The motion for a new trial must therefore be denied, with costs.

INGRAHAM, P. J., and BRADY, J., concurred.

*Motion denied.*